IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



08/16/2006

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JOSEPH MANCUSO, | § | Case No. 04-41757 |
| | § | (Chapter 7) |
| Debtor. | § | |
| _____ | § | |
| KENNETH P. SILVERMAN, ESQ., as | § | |
| Trustee for the Estate of CHIEF | § | |
| EXECUTIVE OFFICERS CLUB, INC., a | § | |
| Chapter 7 Debtor in the Southern District | § | |
| of New York, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 05-4017 |
| | § | |
| JOSEPH R. MANCUSO, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiff, Kenneth P. Silverman, Esq., initiated this action by filing a

Complaint against the Defendant, Joseph R. Mancuso, on January 28, 2005.   In the

Complaint, the Plaintiff objects to the Defendant's discharge pursuant to 11 U.S.C.

§727(a)(3), (a)(4)(A), (a)(5), (a)(6)(C) and (a)(7).   The Court held a trial on the

Complaint on January 17, 2006, and, at the conclusion of the trial, set the matter for a

later ruling.   Pursuant to Rule 52 of the Federal Rules of Civil Procedure, as adopted and

applied to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy

Procedure, the Court enters the following findings of fact and conclusions of law:

### A. Findings of Fact

Prior to trial, the parties entered into a Joint Pre-Trial Order in which they

stipulated to numerous facts.  Based on these stipulations and the evidence presented at trial, the Court makes the following findings of fact:

## 1. The Defendant Founds the Original CEO Club

1.     The Defendant holds an electrical engineering degree from Worcester Polytechnic Institute and a master's degree in business administration from the Harvard Business School.  The Defendant is credited as the author of more than 20 books regarding business and management matters.

2.     The Defendant founded the Chief Executive Officers Club, Inc. (the "<u>Original CEO Club</u>") more than 25 years ago.  The concept grew in popularity over the years, and numerous local chapters formed as separate corporations in the United States and China, among other places (collectively, the "<u>CEO Club Chapters</u>").  Members pay dues and pay to attend programs sponsored by the Original CEO Club or the CEO Club Chapters.  Based on oral agreements between the Defendant, as the chief executive officer of the Original CEO Club, and principals of certain CEO Club Chapters, those chapters shared their income with the Original CEO Club.

3.     The Defendant founded the Original CEO Club as a nonprofit corporation. From 1988 until 2001, he operated the Original CEO Club out of his home at 180 Varick Street in New York, New York.  For many years, the Defendant's wife, Karla, was his business partner.

4.     The Defendant had signatory authority on bank accounts belonging to the Original CEO Club and many of the CEO Club Chapters.  His practice was to periodically sign hundreds of checks on each of the accounts and to leave the blank checks with the principals of the chapters.  Additionally, at least 25 people had authority

to sign checks and other documents for the Defendant.

5.      The Defendant and his landlord, 180 Varick Street Corporation, engaged in a long legal fight regarding the lease of the premises at 180 Varick Street.  The Defendant was a guarantor on the lease, not a tenant.  One of the Defendant's non-profit corporations was the tenant on the lease.

6.      The Defendant ultimately lost the legal battle with 180 Varick Street Corporation.  A judgment was entered in favor of the landlord and against the tenant as well as the Defendant, personally, as a guarantor of the lease.

7.      The Defendant moved to 457 Washington Street in New York City in 2001.  According to the Defendant, his wife subsequently moved to 47 West Street, #5C, in New York City.  The Defendant conducted his business out of both addresses.

8.      In a deliberate effort to thwart the landlord's ability to collect the judgment against him, personally, the Defendant arranged his finances to make his income difficult to trace.  He reported taxable income of $12,000 or less for 2001, 2002 and 2003.  He received these funds from family members, who, in turn, received the funds from either the Original CEO Club or a CEO Club Chapter.

9.      The Defendant, as the chief executive officer of the Original CEO Club, entered into oral agreements with various CEO Club Chapters for the payment of his business and personal expenses.   These CEO Club Chapters regularly paid the Defendant's expenses at his request.  However, it is not clear from the record when these agreements were formed, and the Defendant could not recall which CEO Club Chapters had entered into oral agreements to pay his expenses.

10.     The Defendant made his requests for payment either over the telephone or

via the internet. The Defendant testified that none of the CEO Club Chapters required the Defendant to provide any backup for his claimed expenses, and the Defendant did not keep any records such as airline tickets or parking stubs.

11.     The books authored by the Defendant generated royalty income from Simon & Schuster, among others. The Defendant claimed to have assigned or otherwise transferred the royalty income to entities whose identities he could not recall. Other than the Defendant's testimony, the record does not contain any evidence of the alleged assignments. The Defendant's testimony that he could not recall the identity of any of the assignees was not credible.

12.     In addition to seeking to collect the judgment from the Defendant, 180 Varick Street Corporation sought to collect against the Original CEO Club. It is unclear from the evidence presented at trial whether the judgment was entered against the Original CEO Club as the tenant on the lease or whether the judgment somehow became a judgment against the Original CEO Club at a later date.

13.     In August 2002, several weeks before the Original CEO Club filed for bankruptcy protection, the Defendant, his wife, and an individual named John Brown started a new corporation called "CEO Clubs International, Inc." (the "International Club"). The Defendant, his wife and Mr. Brown were named as directors in the Articles of Incorporation for the International Club.

### 2. The Original CEO Club Files for Bankruptcy in New York[1]

14.     On September 30, 2002, the Original CEO Club filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern

---

[1] The parties' stipulations in the Joint Pre-Trial Order, the Defendant's testimony, and the exhibits admitted at trial provided this Court with detailed information regarding the Original CEO Club's bankruptcy case.

District of New York.  The Defendant signed the petition as the chief executive officer of the Original CEO Club.  The Defendant testified at the trial before this Court that the Original CEO Club filed for bankruptcy in the Southern District of New York as a result of the landlord's collection efforts.

15.     After the Original CEO Club filed for bankruptcy, the Defendant transferred ownership and/or control of the Original CEO Club's web domain name to the International Club.[2]  The Defendant's business associates, many of whom had authority to act on his behalf in connection with his business, continued to update and maintain the Original CEO Club's website.  The Defendant continued to be listed as an officer or chairperson for the Original CEO Club on the website.

16.     On November 18, 2002, the Plaintiff was appointed to operate the business of the Original CEO Club as a Chapter 11 trustee.  On March 11, 2003, the Chapter 11 case was converted to Chapter 7.  The Plaintiff was subsequently appointed as the Chapter 7 trustee.

17.     In June 2003, the Plaintiff initiated an adversary case against the Defendant in the bankruptcy court for the Southern District of New York (the "First New York Adversary Case").  The Plaintiff complained that the Defendant was using and diverting the Original CEO Club's assets post-bankruptcy.  The adversary case was settled pursuant to a Stipulation and Order entered on December 8, 2003.  The Stipulation and Order restrained and enjoined the Defendant from (i) continuing to operate the CEO

_____

[2] At his deposition in the First New York Adversary Case, the Defendant testified that the Original CEO Club leased the domain name for its website from an entity called "Rogue and Scholars."  The Defendant transferred the use or ownership of the domain name to CEO Club International by making the required lease payments to Rogue and Scholars.  The Defendant testified that he did this because the Plaintiff, as the trustee in the Original CEO Club's bankruptcy case, had failed to make the required lease payments.  *See* Exh. C, Mancuso Dep. Tr. at pp. 70-71.  Pursuant to the parties' Joint Pre-Trial Order, the deposition of the Defendant was admitted as evidence at the trial of the instant adversary case.

Club's business and/or use the Original CEO Club's name and assets in any manner; and (ii) disposing, alienating or in any way encumbering any of the Original CEO Club's property over which he continues to exercise possession, custody or control.

18.    A few days after the Bankruptcy Court for the Southern District of New York entered the Stipulation and Order, the Plaintiff sent a letter to counsel for the Defendant in which the Plaintiff complained that the Defendant was in violation of the Stipulation and Order.  The Plaintiff demanded, among other things, that the Defendant cease operating the website for the Original CEO Club.

19.    The Plaintiff deposed the Defendant on February 5, 2004, in connection with the First New York Adversary Case.  During the deposition, the Defendant stated that he was no longer an employee of the Original CEO Club or any of the CEO Club Chapters.  Instead, the Defendant was providing consulting services for "CEO Clubs of China" (the "China Club") based on an oral understanding that he would be compensated. In particular, the China Club had agreed to compensate the Defendant by paying all of his expenses and by paying the Defendant 4% of any "deal" he put together between any U.S. company and a Chinese company.

20.    The Defendant also testified at his deposition that, following the Original CEO Club's bankruptcy, he continued to receive checks from the China Club, the International Club, and various CEO Club Chapters.  He testified that he deposited the checks into various bank accounts and then sent all of the documentation, such as the deposit slips, to various CEO Club Chapters.

21.    The Defendant testified at his deposition that he had made many deposits during the several months prior to his deposition.  However, he could not recall any

details regarding the transactions, such as who sent him the funds to deposit, how much the was sent, which banks he deposited the funds into, or which CEO Club Chapters received the deposits.

22.     After the deposition, the Plaintiff initiated an adversary suit against the Defendant and numerous CEO Club Chapters (the "<u>Second New York Adversary Case</u>"). In the Second New York Adversary Case, the Plaintiff complained, among other things, that the Defendant and others had diverted or were diverting the Original CEO Club's post-petition income to the International Club and other CEO Club Chapters.   The Plaintiff obtained a judgment against the International Club, among others, with damages to be determined at a later hearing.

23.     In March 2004, the Plaintiff brought a contempt proceeding in the Bankruptcy Court for the Southern District of New York against the Defendant based on his alleged violation of the Stipulation and Order.  The contempt proceeding was stayed when the Defendant filed a bankruptcy petition in this Court.  The Plaintiff's allegations of contempt have not yet been tried.

24.     On November 18, 2004, the Bankruptcy Court for the Southern District of New York entered an order compelling the defendants to respond to the Plaintiff's discovery requests in the Second New York Adversary Case.  The Plaintiff's discovery requests, however, were not introduced as evidence at the trial on the Plaintiff's Complaint in this Court.  Thus, it is unclear (i) what documents the Plaintiff was seeking and (ii) what documents the defendants were compelled to provide in the Second New York Adversary Case.

### 3. The Defendant Files Bankruptcy in Texas

### *a. The Petition*

25.     The Defendant filed a Chapter 7 bankruptcy petition in this Court on April 9, 2004.  The petition was signed by Michael D. Siegel, who was also representing the Defendant in connection with the bankruptcy proceedings in New York.

26.     The petition listed the Defendant's address as 4040 Brown Brothers Trail, Denton, Texas 76207.  The petition also disclosed that the Defendant had filed a prior bankruptcy case in 2001 in the Southern District of New York.

### *b. The Schedules and Statement of Financial Affairs*

27.     The Defendant's Schedule A listed no real property.  The Defendant's Schedule B listed personal property consisting of $20 in cash on hand, $1,000 in a checking account at Frost Bank, household goods valued at $1,500, clothes valued at $1,500, and a retirement plan in the amount of $291,446.38.  The Defendant claimed all of this property as exempt in his Schedule C.

28.     The Defendant listed numerous unsecured creditors in his Schedule F, including 18 entities which had issued credit cards to him.  180 Varick Street Corporation was the Defendant's largest unsecured creditor in the amount of $250,000.

29.     In his Schedule G, the Defendant stated that he intended to assume a lease of an apartment.  He listed the landlord as John Brown.

30.     According to his Schedule I, the Defendant's gross monthly income was $1,000 at the time he filed for bankruptcy.  The Defendant stated that he had been employed as a consultant for the "CEO Club Entities" for the past 20 years in his Schedule I.  The Defendant listed the following monthly expenses in his Schedule J:

$200 for food, $100 for clothing, $50 for laundry and dry cleaning, $150 for medical and dental expenses, $200 for transportation (not including car payments) and $50 for charitable contributions.

31.     The Defendant's list of expenses did not include many of the expenses usually listed by debtors in bankruptcy, such as housing expenses and utilities.

32.     In his response to Question No. 1 in his Statement of Financial Affairs, the Defendant stated that he had received $12,000 in annual income from the "CEO Club entities" during 2001, 2002 and 2003.  In his response to Question No. 15, the Defendant stated that he had lived in New York City until August 2003.  In response to Question No. 18, the Defendant stated that he had not been "an officer, director, partner or managing executive of a corporation … within the six years immediately preceding the commencement of this case."

33.     The Defendant testified at the trial of the Trustee's Complaint that he retired from the Original CEO Club and the International Club in December 2002.  However, it was clear from the Defendant's testimony and the evidence presented at trial, including receipts from the "Harvard Club of New York City" showing the Defendant as a sponsor of events even after he filed his bankruptcy petition in this Court, that the Defendant did not retire until much later, if at all.

### c. Mr. Siegel's Disclosure of Compensation

34.     On April 20, 2004, the Defendant's attorney, Mr. Siegel, filed a "Disclosure of Compensation of Attorney for Debtor."  Mr. Siegel's disclosure reflects that he did not receive any money from the Defendant in connection with the bankruptcy filing and that he has not agreed to accept any money from the Defendant.

35.     Mr. Siegel has been and is being paid by several CEO Club Chapters.

### d. The Hearing on November 30, 2004

36.     The Court heard arguments and evidence on November 30, 2004,[3] regarding several motions filed by the Plaintiff.  These motions included a motion to transfer venue to the Southern District of New York, which the Defendant opposed.

37.     At the hearing, the Defendant testified that he could not recall where he was when signed his bankruptcy petition.  He could not recall whether he had ever paid Mr. Siegel or asked anyone else to pay Mr. Siegel to file a bankruptcy petition for him.  He testified that Mr. Brown was his landlord, but he could not recall whether Mr. Brown had ever been a director of any of the CEO Club Chapters.  He testified that he was not sure whether the nonprofit entities to which he "donates" his royalty income from the books he has written are the same entities which pay his expenses.  He was not sure whether he held any copyrights.  He was not sure where the headquarters for the International Club is located, and, when asked whether he had any of its books and records in Texas, he testified that he did not know the answer to the question.

38.     With regard to the propriety of venue in this Court, the Defendant testified at the hearing on November 30, 2004, that he moved to Texas in August 2003 and registered a telephone in his name at that time.[4]  He testified that he had copies of other telephone bills as well as records relating to his personal checking account at Frost Bank in Texas.  He also stated that he had a "file drawer" of documents relating to his

---

[3]     Pursuant to the parties' Joint Pre-Trial Order, a copy of the transcript of this hearing was admitted as evidence at the trial on the Plaintiff's Complaint.

[4]     At the trial of the Plaintiff's Complaint, the Plaintiff introduced evidence establishing that a telephone account was not opened in the Defendant's name at the address listed on the Defendant's bankruptcy petition until April 2004.

involvement with the Original CEO Club and/or the other CEO Club Chapters.

### e. The Texas Adversary Proceeding

39.     The Plaintiff initiated this adversary case on January 18, 2005, pursuant to an order entered by this Court extending the time for objecting to discharge.

40.     On June 3, 2005, the Plaintiff submitted a request for the production of documents to counsel for the Defendant.  The Plaintiff requested, among other things, bank statements, bills for the premises at 4040 Brown Brothers Trail in Denton, Texas, any documents relating to services performed by the Defendant for the Original CEO Club or any of the CEO Club Chapters, and an accounting of all money the Defendant transferred or caused to be transferred from the Original CEO Club and any of the CEO Club Chapters.

41.     Although the Defendant testified at the hearing on November 30, 2004, that he had a file drawer of documents regarding his involvement with the Original CEO Club and/or the other CEO Club Chapters, the Defendant never produced any of these documents to the Plaintiff.

42.     Although the Defendant testified at the hearing on November 30, 2004, that he had copies of telephone bills in his car, the only telephone bill he has produced to the Plaintiff is the bill that was introduced as evidence at that hearing.

43.     The Defendant has produced only five documents to the Plaintiff relating to his personal finances and business dealings:  the individual income tax return he filed in New York for 2003; one page relating to the individual income tax return he filed in New York for 2004; the front page of his passport, which is illegible; the telephone bill described *supra*; and a copy of the Rental/Lease Agreement for 4040 Brown Brothers

Trail, Denton, Texas.[5]

44.     The Rental/Lease Agreement commenced August 1, 2003.    The Rental/Lease Agreement lists Mr. Brown (one of the original directors of the International Club) as the Landlord and the Defendant as the Tenant.  However, pursuant to an unwritten agreement with the Defendant, the residence was made available to the Defendant rent-free, and Mr. Brown paid all of the utility bills.  In exchange, one or more of the CEO Club Chapters was to provide Mr. Brown an all-expenses-paid trip to a location of his choice.

45.     The Defendant has never produced any documents to the Plaintiff relating to his business dealings with the Original CEO Club, the International Club or other the CEO Club Chapters following the Plaintiff's appointment as the trustee in the Original CEO Club's bankruptcy case.  Further, during the Plaintiff's deposition of the Defendant in connection with the First New York Adversary Case, the Defendant could not recall any details regarding these business dealings.  Similarly, during the trial of the Plaintiff's Complaint in this Court, the Defendant could not recollect basic information regarding his dealings with the Original CEO Club or any of the CEO Club Chapters, such as the identity of the principals of certain CEO Club Chapters with which he continued to do business and the functions he recently attended.

46.     The Defendant knew of the importance of keeping detailed records regarding his financial involvement (if any) with the Original CEO Club and the CEO Club Chapters.  The Defendant knew that the failure to keep detailed records could lead to tax problems and problems with the non-profit status of these entities.  At the trial of

_____

[5] In addition, the transcript of the deposition taken in the First New York Adversary Case reflects that the Defendant produced certain documents reflecting the formation of the International Club, including the certificate of incorporation and the by laws for the International Club.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW – Page 12**

the Complaint, the Defendant testified that, prior to the appointment of the Plaintiff as the trustee in the Original CEO Club's bankruptcy case, he kept such records.

47.     In contrast, with respect to his personal information, the Defendant testified that it is not his practice to keep copies of any of his bank account statements, credit card statements, records relating to his business expenses, or records relating to payments he receives from the Original CEO Club or any of the CEO Club Chapters. Even after he was sued by the Plaintiff for diverting the Original CEO Club's assets while the Original CEO Club's bankruptcy case was pending, the Defendant continued to destroy or fail to keep any records relating to his personal finances.  The Defendant also did not keep any record of his business transactions relating to the CEO Club Chapters with which he, by his own admission, continued to do business.

48.     The Defendant's testimony that the Plaintiff took his personal documents when the Plaintiff took over as the trustee for the Original CEO Club was not credible. Likewise, the Defendant's testimony that he gave his personal financial records to the Chapter 7 trustee in his personal bankruptcy case was not credible.  Such testimony conflicted with the Defendant's testimony regarding his long-standing practice of destroying or otherwise disposing of his personal records.  The Defendant's testimony that the Plaintiff and/or the Chapter 7 trustee took all of his records also conflicted with his testimony at the hearing on November 30, 2004, that he had a file drawer of records regarding his involvement with the Original CEO Club and/or other CEO Club Chapters.

49.     The Defendant's testimony that he did not recall whether he had ever submitted a letter of resignation to the Original CEO Club was not credible.  No such letter was introduced into evidence for the Original CEO Club or any other business

entity with which the Defendant was involved.

50.     After the Original CEO Club filed for bankruptcy and after the Defendant filed his own bankruptcy petition, the Defendant continued to hold himself out as an officer of the Original CEO Club.  For example, the Defendant sent (or authorized an agent to send) an e-mail on July 14, 2004, describing himself as the chief executive officer of "CEO Clubs."

### B. Conclusions of Law

51.     This Court has jurisdiction to consider the Plaintiff's Complaint pursuant to 28 U.S.C. §§1334 and 157(a).  The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as set forth in 28 U.S.C. §157(b)(2)(A), (J), and (O).

52.     Section 727 of the Bankruptcy Code provides that the Court must grant a discharge to a Chapter 7 debtor unless one or more of the specific grounds for denial of a discharge listed in paragraphs (1) through (10) of §727(a) is proven to exist.   The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor.  *See Friendly Finance Discount Corp. v. Jones (In re Jones)*, 490 F.2d 452 (5th Cir. 1974).  Further, under Federal Rule of Bankruptcy Procedure 4005, the burden of proof is on the Plaintiff.

### 1. 11 U.S.C. §727(a)(3)

53.     Section 727(a)(3) requires debtors to maintain records in order to obtain a discharge in bankruptcy.  *See, e.g., In re Esposito*, 44 B.R. 817 (Bankr. S.D.N.Y. 1984). Section 727(a)(3) specifically provides as follows:

> The court shall grant the debtor a discharge, unless ... the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any

recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

54.     Thus, in this case, the Plaintiff must establish by a preponderance of the evidence *either* that the Defendant failed to keep or preserve recorded information, including books, documents, records and papers, *or* that the Defendant engaged in an act of destruction, mutilation, falsification or concealment of such recorded information.  If the Plaintiff's burden is satisfied, the burden of proof shifts to the Defendant to prove that the inadequacy in keeping or maintaining records is justified under the circumstances of this case.  *See Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003) (debtor's explanation for inadequate books and records must be satisfactory).

55.     Here, the Defendant admitted that he destroyed and failed to preserve his personal financial information during the years preceding his personal bankruptcy case. He failed to keep or to preserve any information that would provide a road map for creditors to understand his financial condition, such as bank statements, credit card records, ledgers, or check registers.  The Court, therefore, finds that the Plaintiff has satisfied his burden of proof under §727(a)(3), and the Defendant must justify his failure to keep or maintain records.

56.     The Defendant argued at trial that since it was his regular practice to destroy his financial records, his actions did not violate §727(a)(3).

57.     The Defendant misunderstands the purpose of §727(a)(3).  The purpose of this provision is to ensure that creditors receive sufficient information to trace a debtor's financial history for a reasonable period prior to the debtor's bankruptcy.  *See, e.g., In re*

*Trogdon,* 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990).  A debtor's financial records need not contain "full detail," but "there should be written evidence" of the debtor's financial condition.  *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201 (5th Cir. 1974); *In re Dennis,* 330 F.3d 696, 703 n.5 (5th Cir. 2003) (reaffirming vitality of *Goff*).  With regard to self-employed debtors, the bankruptcy court may properly focus "upon the size and nature of [the debtor's] self-employment."  *In re Redfearn*, 29 B.R. 739 (E.D. Tex. 1983) (citing *Matter of Oesterle*, 651 F.2d 401 (5th Cir. 1981)).

58.    The Defendant in this case was an officer of at least two corporations in the years prior to bankruptcy – the Original CEO Club and the International Club.  He was deeply involved with many more of the CEO Club Chapters, as evidenced by his signatory authority on bank accounts belonging to various CEO Club Chapters.  The Defendant deposited money from various CEO Club Chapters into accounts other than his personal account at Frost Bank, and he endorsed hundreds of blank checks on accounts belonging to various CEO Club Chapters.[6]

59.    The source of the income reported by the Defendant in the three years prior to bankruptcy in his bankruptcy schedules is unclear.  There is no evidence as to which CEO Club Chapters paid for his "consulting" services or reimbursed his expenses.  It also is not clear how or when the Defendant accumulated a retirement account of nearly $300,000.

60.    Although the Plaintiff's counsel has diligently pursued the Defendant, the Plaintiff's income and expenses are untraceable because of the Defendant's practice of destroying all of his financial information.  The problems caused by this practice were

---

[6]  It is unclear from the record why the Defendant, who described himself as a "consultant" for the "CEO Club Entities" in the bankruptcy schedules he filed with this Court, had such involvement in the finances of the CEO Club Chapters.

compounded by the Defendant's claimed inability to recall any of the material details of the financial transactions in which he was involved.

61.     The Defendant did not offer any explanation for his failure to keep books and records, other than avoiding 180 Varick Street Corporation's attempt to collect its judgment against him.  The Court cannot sanction this practice, especially when the Defendant continued destroying or failing to keep records long after the Plaintiff instituted the First New York Adversary Case regarding his transactions with the Original CEO Club, the International Club and the other CEO Club Chapters.

62.     Through the simple expedient of not keeping records and not remembering transactions, the Defendant has frustrated the Plaintiff's efforts in discovering the Defendant's income and assets, and his creditors are unable to determine his financial condition.

63.     The Defendant's failure to keep financial records and his destruction of documents was not justified under the circumstances of this case.  For the foregoing reasons, the Court concludes that the Plaintiff established, by a preponderance of the evidence, his objection to the Defendant's discharge pursuant to §727(a)(3).

64.     Having found that the Defendant's discharge should be denied pursuant to §727(a)(3), it is not necessary for the Court to discuss the remainder of the Plaintiff's objections to the Defendant's discharge.  The Court, however, will address the Plaintiff's remaining objections in order to provide the parties with a full discussion of the issues presented at trial.

## 2.  11 U.S.C. §727(a)(4)(A)

65.     Section 727(a)(4)(A) provides that the Court must deny the debtor a

discharge if the debtor, knowingly and fraudulently, in or in connection with the case, made a false oath or account.  The purpose of this section is to encourage debtors to deal honestly with their creditors by making full and complete disclosure.  "The debtor must be scrupulous in giving notice of all assets to which others may make a legitimate claim." *In re Sullivan*, 204 B.R. 919, 942 (Bankr. N.D. Tex. 1997) (citing *Banc One, Texas, N.A. v. Braymer (In re Braymer),* 126 B.R. 499, 502 (Bankr. N.D. Tex. 1991)).

66.     In order prevail on his §727(a)(4)(A) objection to discharge, the Plaintiff must prove, by a preponderance of the evidence, that (i) a statement was made under oath, (ii) the statement was false, (iii) the Defendant knew the statement was false when made, (iv) the Defendant made the statement with fraudulent intent, and (v) the statement relates materially to the bankruptcy case.  *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001); *Beauboef v. Beaubouef (In re Beaubouf)*, 966 F.2d 174, 178 (5th Cir. 1992).

67.     False oaths sufficient to justify the denial of discharge include "(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings."  *In re Beauboef*, 966 F.2d at 178 (citation omitted).  As the Fifth Circuit has noted, "[t]he subject matter of a false oath is 'material,' and, thus, sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  *Id.* at 177.  Further, as noted by the Eleventh Circuit:

> The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false

> statement. Creditors are entitled to judge for themselves what will benefit, and
> what will prejudice, them. The veracity of the bankrupt's statements is essential to
> the successful administration of the Bankruptcy Act.

*In re Chalik*, 748 F.2d 616, 617 (11th Cir. 1984); *see also In re Beaubouef,* 966 F.2d. at

178 (quoting *In re Chalik*).

68.     Here, the Defendant made the statements in his bankruptcy schedules and

Statement of Financial Affairs under oath.    *See* FED. R. BANKR. P. 1009.    By the

Defendant's own admission, he falsely stated that he had not been an officer of a

corporation within the six years preceding his bankruptcy petition in response to Question

No. 18 in his Statement of Financial Affairs.  The Defendant testified at trial that he did

not "retire" from the Original CEO Club until December 2002.  He further testified that

he was a director of the International Club until he "resigned" in December 2002.

69.     With respect to the Defendant's income and expensess, although the

Defendant testified that various CEO Club Chapters reimbursed or pre-paid the

Defendant for his business and personal expenses, the Defendant failed to report any

income relating to the reimbursement of his expenses in his Schedule I or in response to

Question No. 1 in his Statement of Financial Affairs, which calls for a debtor to report his

"gross income.".  Similarly, although the Defendant testified that he incurred expenses in

connection with his consulting work for the CEO Club Chapters, he failed to list any such

expenses in his bankruptcy schedules.[7]

70.     Additionally, the Debtor testified falsely to this Court.  He testified on

November 30, 2004, that he had a file drawer of documents relating to his business

dealings with the CEO Club Chapters.  However, he failed to produce these records to the

---

[7]   Schedule J requires, among other things, disclosure of personal expenses as well as regular
expenses from the operation of a business.

Plaintiff in response to the Plaintiff's subsequent discovery request. The Defendant testified at trial on January 28, 2006, that he had not kept any such records.[8]

71.    The Defendant knew that each of these statements was false when he made the statement.

72.    He made each of the false statements with the intent of concealing his business relationships and dealings from his creditors. His fraudulent intent can be inferred from, among other things, the false and misleading testimony by the Defendant in this case. *See, e.g., In re Topping,* 84 B.R. 840 (Bankr. M.D. Fla. 1988).

73.    The omission of the Original CEO Club, the International Club and any other entity in which he had held a management position in the preceding six years from his response to Question No. 18 in his Statement of Financial Affairs is material since such information would have illuminated the Defendant's business transactions and the source of his income. *See, e.g., Walters v. Sawyer (In re Sawyer),* 130 B.R. 384, 394 (Bankr. E.D.N.Y. 1991).

74.    The Defendant's false statements relating to his income and expenses also are material to his bankruptcy case. Given the Defendant's education and business experience, the Court finds that he was well aware that cash payments received by him from the CEO Club Chapters constituted "gross income" for the years 2001, 2002, and 2003. The Defendant's failure to disclose his business expenses and related reimbursements anywhere in his bankruptcy schedules or his Statement of Financial

---

[8]    Because this case relates to another Chapter 7 case, some of the references to the "trustee" at trial were unclear. To the extent the Defendant's testimony at trial could be interpreted as stating that he turned over his file drawer of records to the Chapter 7 trustee in this case, the Court notes that the meeting of creditors (at which the Chapter 7 trustee examined the Defendant's schedules and statements pursuant to 11 U.S.C. §341) was held in this case on May 21, 2004 – more than six months before the hearing on November 30, 2004.

Affairs was a false account knowingly made by the Defendant for the purpose of deceiving his creditors.

75.     For the foregoing reasons, the Court finds that the Plaintiff has established, by a preponderance of the evidence, that the Defendant's discharge should be denied pursuant to §727(a)(4)(A).

### 3.  11 U.S.C. §727(a)(5)

76.     Section 727(a)(5) states that a debtor will be denied a discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  The initial burden of going forward with evidence is on the objector, who must introduce more than merely an allegation that the debtor has failed to explain losses. Once the objector has introduced some evidence of the disappearance of substantial assets or of unusual transactions, the debtor must satisfactorily explain what happened. *In re Reed*, 700 F.2d 986, 992-993 (5th Cir. 1983).

77.     A satisfactory explanation has not been definitively defined, but the debtor must explain the losses or deficiencies in such manner as to convince the court of good faith and businesslike conduct.  A satisfactory explanation "must consist of more than the vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir. 1966); *see also Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984) (citing *Baum*).

78.     Here, the Plaintiff established (through the Defendant's testimony) that the Defendant was entitled to receive royalty income for books he had authored.

79.     The Plaintiff also established that the Defendant received funds from

various CEO Club Chapters prior to his bankruptcy.  The Defendant deposited those payments into bank accounts upon which he had signatory authority.

80.     The Plaintiff also established that various CEO Club Chapters paid the Defendant's personal and business expenses in exchange for his work for those CEO Club Chapters as well as his appearance at events sponsored by the CEO Club Chapters.

81.     As discussed in connection with the Plaintiff's §727(a)(3) objection to the Defendant's discharge, the Defendant kept no records regarding any deposits into or withdrawals from any of the bank accounts upon which the Defendant had signatory authority.  Likewise, the Defendant kept no records to show what the Defendant's "in kind" exchanges were with any of the CEO Club Chapters.

82.     The Plaintiff's evidence was sufficient to shift the burden to the Defendant to explain his financial transactions.  The Defendant, however, failed to provide a satisfactory explanation of the monies he received prior to filing for bankruptcy or the loss of his financial records documenting that income, other than that he destroyed his records or did not keep copies.  The Defendant's testimony that he could not recall (i) any of the details of the cash or "in kind" exchanges he received from any of the CEO Club Chapters or (ii) the identity of the principals he regularly did business with at any of the CEO Club Chapters, was not credible.

83.     The Defendant's vague testimony, such as his testimony that could not recall which CEO Club entities were receiving his royalty income, was insufficient to satisfy his burden under §727(a)(5).

84.     A sophisticated debtor cannot explain away his involvement with corporations as a lack of memory.  *See Nisselson v. Wolfson (In re Wolfson),* 139 B.R.

279, 289 (Bankr. S.D.N.Y. 1992).  To earn a discharge, a debtor must cooperate with the Court and all parties in interest. "[C]omplete disclosure is the touchstone in a bankruptcy case." *Continental Ill. Nat'l Bank & Trust Co. v. Bernard (In re Bernard),* 99 B.R. 563, 570 (Bankr. S.D.N.Y. 1989).

85.     In this case, the Defendant's evasive testimony and his failure to adequately explain his business and personal transactions prior to filing his bankruptcy petition justifies the conclusion that he should be denied a discharge under §727(a)(5).

### 4.  11 U.S.C. §727(a)(6)(C)

86.     Section 727(a)(6)(C) denies a discharge to a debtor who refuses to respond to a material question approved by the court or refuses to testify on any ground other than the properly invoked privilege against self-incrimination.  Thus, "a bankruptcy court may not use denial of a discharge as a *sanction* for a debtor's refusal to testify because of the privilege." *In re Moses,* 792 F.Supp. 529, 534 (E.D. Mich., 1992).  "Court" means a judge and not simply a trustee, U.S. trustee or other official.  *See Gore v. Kressner (In re Kressner),* 206 B.R. 303 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 919 (2nd Cir. 1998) (refusal to answer question at a Rule 2004 examination ordered by the court was not a refusal to answer a question ordered by the court).

87.     Here, the Defendant did not refuse to testify or respond to questions, and he did not invoke his privilege against self-incrimination.  The Court, therefore, concludes that §727(a)(6)(C) does not apply to this case, and the Plaintiff's objection to discharge based on §727(a)(6)(C) should be denied.

### 5.  11 U.S.C. §727(a)(7)

88.     Section 727(a)(7) provides that "the Court shall grant a debtor a discharge,

unless -- . . . the debtor has committed any act specified in paragraph (2), (3), (4), (5) or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider."

89.    Section 727(a)(7) extends the basis for denial of discharge to the debtor's misconduct in a substantially contemporaneous related bankruptcy case. Thus, if the debtor engages in objectionable conduct in a case involving a relative of the debtor, a partnership in which the debtor is a partner, a general partner of the debtor or a corporation of which the debtor is an officer, director or controlling person, the debtor may be denied a discharge in the debtor's own case. *See, e.g., In re Powell*, 88 B.R. 114 (Bankr. W.D. Tex. 1988) (company engaged in jewelry business was "insider" of Chapter 7 debtor husband, and, thus, failure of company to account for deterioration of its inventory or preserve its records warranted denial of debtor-husband's discharge); *Tucker v. Devine* (*In re Devine*), 11 B.R. 487 (Bankr. D. Mass. 1981) (debtor who was an insider of a corporation that had also filed a petition was denied a discharge when the debtor failed to produce books and records for the corporation).

90.    In this case, with regard to whether the Defendant was an "insider" of the Original CEO Club during the relevant time period, his nominal resignation from the Original CEO Club is irrelevant (if it occurred at all). *See In re Krehl,* 86 F.3d 737, 742-43 (7th Cir. 1996).

91.    However, the Plaintiff did not identify which subsection of §727(a) the Defendant is alleged to have violated in connection with the Original CEO Club's bankruptcy case.  The Plaintiff's Complaint simply recites the facts that the Plaintiff

believes constitute grounds for denial of discharge under §727(a)(7).

92.    A valid claim under §727(a)(7) exists if the Plaintiff can establish that the Defendant had a position of authority with the Original CEO Club and violated §727(a)(2)(B), for example, by attempting to exercise dominion over the Original CEO Club's assets after conversion of the corporate case to Chapter 7. *See id.* at 742-44; *In re Powell,* 88 B.R. 114, 116-18 (Bankr. W.D. Tex. 1988); *In re Kessler,* 51 B.R. 895, 897-99 (Bankr. D. Kan. 1985).  A valid claim under §727(a)(7) also exists if the Plaintiff can establish that the Defendant violated §727(a)(3), for example, by destroying the Original CEO Club's books and records.

93.    With respect to a potential claim under §§ 727(a)(7) and (a)(2)(B), the Plaintiff's evidence in this case was insufficient for the Court to conclude that the Defendant intercepted funds that should have gone to the Original CEO Club and diverted those funds to other CEO Club Chapters with which he had income-sharing arrangements.

94.    With respect to a potential claim under §§ 727(a)(7) and (a)(3), the Defendant consistently and deliberately deprived the Plaintiff, who is the trustee in the Original CEO Club's bankruptcy case, of helpful information.   The Defendant deliberately failed to keep or record any information regarding his financial involvement with the CEO Club Chapters after the conversion of the Original CEO Club's case to Chapter 7 and the appointment of the Plaintiff as trustee in that case.  The Defendant's conduct is especially disturbing in light of the alleged oral income-sharing arrangements between the Original CEO Club and various CEO Club Chapters.[9]

_____

[9] The Defendant did not include any personal right to share income from any of the CEO Club Chapters as an asset in the bankruptcy schedules he filed with this Court.

95.     Although the Court is troubled by the Defendant's conduct, it is the Plaintiff's burden to establish a violation of §§ 727(a)(7) and (a)(2)(B) by a preponderance of the evidence.  The Plaintiff, however, failed to provide sufficient evidence for the Court to conclude that the Defendant concealed or failed to preserve recorded information regarding the Original CEO Club's financial condition within the applicable one-year period.

96.     Additionally, the Court cannot determine, on the record before it, whether there was any loss of assets in the Original CEO Club's bankruptcy case within the meaning of §727(a)(5) or whether the Defendant made any false oath in the Original CEO Club's bankruptcy case within the meaning of §727(a)(4).

97.     For the foregoing reasons, the Court concludes that the Plaintiff has not sustained his burden of proof under 11 U.S.C. § 727(a)(7), and his objection to discharge on this ground should be denied.

### C. Conclusion

The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.  To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  The Court reserves the right to make additional findings as necessary or as requested by any party.


Signed on 8/16/2006

*Brenda T. Rhoades*                    MD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE